**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | : | |
|---|---|---|
| **DONNIS ALFORD ET AL.**, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | 7:05-cv-78 (HL) |
| v. | : | |
| | : | |
| **CORDELE FOODS, INC. d/b/a** | : | |
| **SHONEY'S OF CORDELE and** | : | |
| **DALLAS HUNT**, | : | |
| | : | |
| Defendants. | : | |

## ORDER

Before the Court are Defendants' Motion for Summary Judgment (Doc. 36) and Plaintiffs' Requests for Oral Argument (Docs. 80, 84). After a review of the record, the Court finds that oral argument would not aid in resolution of the Motion for Summary Judgment, and it is therefore denied. For the foregoing reasons, the Motion for Summary Judgment is granted in part and denied in part.

**I.    BACKGROUND**

On or about June 17, 2003 a group of thirty-nine African-American travelers from Memphis, Tennessee ("the Memphis Plaintiffs") and an unrelated group of fifty African American travelers from Atlanta, Georgia ("the Atlanta Plaintiffs") stopped at Shoney's in Cordele, Georgia for breakfast. They claim that the employees of Shoney's refused to serve them and that this refusal was due to racial discrimination. The merits of this case rest largely on the details and timing of the events during Plaintiffs' wait at the restaurant. These

1

details, however, are highly disputed. What follows is a description of Plaintiffs' experience at Cordele Shoney's on the date in question, construing the testimony in the light most favorable to Plaintiffs.

Shortly before either of the groups of Plaintiffs arrived, Shoney's employees had served two full buses of guests with approximately forty-five people on each bus. One of those was a group of African American cheerleaders. The Shoney's staff was able to accommodate both busloads although they arrived within fifteen minutes of each other. Both groups departed before any of the Plaintiffs arrived, and there were many available seats in the restaurant the entire time that Plaintiffs were there.

Of the two groups of Plaintiffs, the Memphis bus was the first to arrive. Shoney's hostess Sabrina Johnson greeted Monroe Ballard, Sr. at the entrance of the restaurant. Ballard, who was the designated leader of the Memphis group, requested service on behalf of the people on his bus. Johnson advised him that there would be a short wait while employees prepared a sufficient number of tables for the guests. Ballard stated that his group could wait. At some point Plaintiffs communicated that they wanted to be seated separately in smaller parties; it is not clear, however, when that request was made. Defendants contend that Johnson and Ballard agreed that the group would be seated together. According to Plaintiffs, Ballard made it clear that they did not have to be seated as a group because they each had their own money and would pay individually.

Plaintiffs inquired about the delay after they waited what appeared to be an unreasonable time, given the number of open tables in the restaurant. Ballard had his first conversation with the manager, Royce Wiley, approximately twenty-five minutes after his

2

group arrived at Shoney's. During this conversation, he either stated for the first time, or possibly reiterated, the group's desire to be seated individually. Shoney's employees testified that typically they would allow large groups to sit individually if that is how the guests wished to be seated. The manager, however, refused to seat Plaintiffs individually and told them that they could either be sat as a group, or move on to another restaurant.

At some point after this conversation, the bus from Atlanta, Georgia arrived at Shoney's. Donnis Alford entered the restaurant on behalf of the Atlanta bus to speak with the hostess, who told her that she could not seat her group. The hostess apparently assumed that Alford was a member of the Memphis group.

The manager reemerged from the back of the restaurant approximately twenty minutes after his first conversation with Ballard and informed Plaintiffs that Shoney's would not serve them. He offered no explanation for refusing them service. Members of both the Atlanta and Memphis bus remained at the restaurant out of confusion and the belief that they still might be sat if they continued to wait.

The manager then called the police to have Plaintiffs removed from the restaurant. Upon arriving, law enforcement officials determined that they could not remove Plaintiffs because they were not acting unlawfully and were causing no disturbance. The officers also stated that they could not force the manager to serve Plaintiffs, and they suggested to Plaintiffs that they eat breakfast elsewhere. Subsequently, both groups went their separate ways, leaving Shoney's and choosing different restaurants for breakfast.

The Memphis Plaintiffs estimated that their total time spent waiting at Shoney's was about an hour. Although the Atlanta Plaintiffs arrived after the Memphis Plaintiffs, they

3

also estimated they waited for a total of about an hour. During this time, several groups of white patrons were seated while Plaintiffs waited for their tables. Plaintiffs estimate that Shoney's employees sat as many as twenty white people who arrived after they did. These customers did not enter in one large group, but instead were in groups of two to six. Employees let at least two of these customers in through the service door, which provided access to the dining area by walking through the kitchen. Plaintiffs maintain that despite their frustration that white guests were seated after they arrived, they waited patiently in the lobby of the restaurant.

It is undisputed, however, that members of the group expressed their dissatisfaction in the restaurant. Someone in the group said, " good ole [Cordele], Georgia, the American way . . . No, America 2003 it never has changed." (DVD). Also, someone called a news reporter to report on the alleged discrimination. The hostess testified that an individual in the Memphis Plaintiffs' group commented to her that Shoney's employees "don't want to sit black people." (S. Johnson Dep. 14:11-19). In addition, when other customers asked Plaintiffs about the situation, Plaintiffs replied that they were not being seated. It is not clear, however, when these remarks were made.

Three of the Memphis plaintiffs concede that they did eat from Shoney's breakfast bar. After Cecil Loney was refused service, he served himself at the breakfast bar and got his own beverage. He maintains that the waitresses attempted to prevent him from serving himself by covering the food and taking away the serving utensils. He also testified that the waitress refused to take his payment when he offered to pay. Likewise, Chandra White allowed her son to eat off the breakfast bar, despite Shoney's refusal to serve them. She

4

made a plate for him, sat herself and her son at an empty table, and shared the food on the plate with him. She requested orange juice from one of the servers, but the woman refused to bring it to her and refused her offer of payment.

After departing from Shoney's in Cordele, Donnis Alford phoned in a complaint using a phone number provided to her by Shoney's employees at the Cordele Shoney's. She spoke with Dallas Hunt, who is the Chief Executive Officer and one of the two shareholders of Cordele Foods, the company that owns the Shoney's at issue. He apologized, stated that he would investigate the situation, and offered coupons as a conciliatory gesture for the Atlanta Plaintiffs' experience. Hunt also offered gift certificates for the Memphis Plaintiffs to Joanne Ballard, who was Monroe Ballard, Sr.'s wife. Hunt was not at the Cordele Shoney's the day of the incident, although he did admit to previously providing some limited training to his managers on customer service. In his testimony, he recognized the heightened staffing and service challenges that arise when serving large parties, but stated that if a party requested to be seated individually, then Shoney's would honor that request.

## II. ANALYSIS

Defendants seek summary judgment on three grounds. First, they argue that Plaintiffs have failed to establish a prima facie case of intentional discrimination. Second, they claim that Cecil Loney's rights under § 1981 were not violated. Third, they argue that Plaintiffs have failed to establish that Defendant Dallas Hunt has any connection with the alleged discriminatory conduct on which liability could attach. The Court addresses each argument in turn.

5

### A. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a defendant's motion for summary judgment, the court takes the facts in the light most favorable to the plaintiff. Stanley v. City of Dalton, 219 F.3d 1280, 1287 (11th Cir. 2000). The initial burden lies on the movant to demonstrate that the nonmovant lacks evidence to support an essential element of its claim. Lowe v. Aldridge, 958 F.2d 1565, 1569 (11th Cir. 1992). The burden then shifts to the nonmovant, who must come forward with some evidence that would allow a jury to find in his favor, even if the parties dispute that evidence. Id. The nonmoving party may use his own depositions or affirmations to defeat summary judgment. James Wm. Moore, Moore's Federal Practice (3d ed. 2007). If the evidence that the nonmovant presents, however, is "merely colorable" or "not significantly probative," then summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

### B. Prima Facie Case of Intentional Discrimination

Section 1981 prohibits intentional, purposeful discrimination in the making and enforcing of private contracts. 42 U.S.C.A. § 1981(a) (West 2003); see also Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982). The statute states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . .
> For the purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C.A. § 1981(a)-(b). The analytical framework for establishing evidence of intentional discrimination in a § 1981 case is the same as that which courts use in Title VII cases. Standard v. A.B.E.L. Svcs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); see also Brown v. Am. Honda Motor Co., Inc., 939 F.2d 946, 950 (11th Cir. 1991) (discussing McDonnell Douglas framework in § 1981 case). A plaintiff may meet his burden of proof with direct evidence of intentional discrimination. Hinson v. Clinch County, Ga. Bd. of Educ., 231 F.3d 821, 827 (11th Cir. 2000). In the absence of direct evidence, however, he may employ the burden-shifting scheme described in McDonnell Douglas Corp. v. Green. 411 U.S. 792, 802 (1973) (establishing burden-shifting mechanism for proving intentional discrimination in circumstantial case).

### 1. Direct Evidence

Plaintiffs assert that "[t]he record is replete with evidence of direct discrimination."[1] (Pls.' Br. Resp. Defs.' Mot. Summ. J. 3). In support of this statement, they cite the following facts: (1) all Plaintiffs are African American, (2) Caucasian customers, who arrived after Plaintiffs, were seated and served while Plaintiffs waited to be sat, and (3) some of the Caucasian customers were allowed to enter through the back door of the restaurant.

"Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact in issue without inference or presumption. Only the most blatant

---

[1] It is not clear whether by alleging "direct discrimination" Plaintiff is making an argument that there is direct evidence of discrimination. In the interest of thoroughly exploring Plaintiffs' available arguments, the Court addresses whether there is direct evidence of discrimination.

7

remarks, whose intent could be nothing other than to discriminate on the basis of [a protected characteristic] constitute direct evidence of discrimination." Bass v. Bd. of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1105 (11th Cir. 2001) (quotations, alterations, and citations omitted); see also Ferrill v. Parker Group, Inc., 168 F.3d 468, 472 (11th Cir. 1999) (finding evidence that a company assigned employees to certain tasks on the basis of race is direct evidence of intentional discrimination).

Plaintiffs uniformly testified that no Shoney's employee used racial epithets or made derogatory comments. There is also no evidence that they stated they would not seat them because they were black, or that they required large groups of African-American people to sit together instead of individually. Even if the facts alleged are believed, a fact finder could only find Plaintiffs were discriminated against by inference. There is therefore no direct evidence of discrimination in this case.

 2. Indirect Evidence

  a. Prima Facie Case

Under the McDonnell Douglas framework the plaintiff bears the initial burden of establishing his prima facie case of discrimination by a preponderance of the evidence. Brown, 939 F.2d at 949. The framework is flexible, and courts may adapt it to fit different factual scenarios. See McDonnell Douglas Corp., 411 U.S. at 802 n.13 (stating that the proof for a prima facie case may vary depending on the facts). The Eleventh Circuit has not, however, articulated a prima facie test to apply in claims arising out of retail transactions. Kinnon v. Arcoub, Gopman & Assoc., Inc., 490 F.3d 886, 893 (11th Cir. 2007). Nonetheless, district courts have formulated a test that applies to situations involving

8

discrimination in restaurant service. It requires the plaintiff to show: (1) he is a member of a minority group, (2) the discriminatory conduct involved an activity protected under § 1981, and (3) similarly situated individuals who are not African American received more favorable treatment than the plaintiff did. Slocum v. Waffle House, Inc., 365 F. Supp. 2d 1332, 1338 (N.D. Ga. 2005); see also Jackson v. Waffle House, 413 F. Supp. 2d 1338, 1355 (N.D. Ga. 2006). But see Kinnon, 490 F.3d at 893 (declining to decide whether this specific formulation of the prima facie test is correct).

Other jurisdictions that have applied § 1981 to allegations of discrimination in the retail setting have adopted a prima facie test that is similar to the one the court used in Slocum. See Murrell v. Ocean Mecca Motel, Inc., 262 F.3d 253, 257 (4th Cir. 2001) (applying McDonnell Douglas framework to § 1981 claim alleging discrimination by motel); Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 872 (6th Cir. 2001) (applying similar test but refusing to impose categorical requirement that plaintiff present evidence of similarly situated shoppers); Lizardo v. Denny's Inc., 270 F.3d 94, 101-04 (2nd Cir. 2001). The Slocum test serves the purpose of the McDonnell Douglas burden-shifting framework by establishing an inference of intentional discrimination. Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642 (11th Cir. 1988). It "sharpen[s] the inquiry into the elusive factual question of intentional discrimination" and "eliminat[es] the most common nondiscriminatory reasons for the plaintiff's treatment." See Burdine, 450 U.S. at 254, 256 n.8 (discussing the usefulness of the McDonnell Douglas framework). This Court therefore adopts the Slocum analysis.

With the exception of Plaintiff Cecil Loney, Defendants do not dispute that

9

Plaintiffs meet the first two prongs of the test. They argue, however, that Plaintiffs' claims fail under the third requirement because Plaintiffs cannot point to similarly situated individuals who were treated more favorably than they were and who are not members of a minority group. They contend that while Plaintiffs waited, the only Caucasian people Shoney's sat were in smaller parties of two to six people, and these smaller groups cannot serve as comparators for the Plaintiffs' groups of thirty-nine and fifty.

The Eleventh Circuit set a high standard for comparators in Maniccia v. Brown. 171 F.3d 1364, 1368 (11th Cir. 1999).[2] In that employment discrimination case, the court stated that "the quantity and quality of the comparator's misconduct [must] be *nearly identical*" to the plaintiff's. Id. (emphasis added). This requirement prevents courts from comparing employees who are fundamentally different from each other and protects the employer's freedom to make reasonable decisions. Id. The individuals who are compared with the plaintiff must therefore be "similarly situated in all relevant respects." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). Whether a comparator is similarly situated is typically a question of fact for the jury. Slocumb, 365 F. Supp. 2d at 1339 n.6 (citing Lizardo, 270 F.3d at 101). Even assuming the "nearly identical" standard applies to claims alleging discrimination in the retail context,[3] Plaintiffs have submitted sufficient evidence

---

[2] A later panel decision called into question Manicca's standard. Alexander v. Fulton County, Ga., 207 F.3d 1303, 1334 (11th Cir. 2000). The Eleventh Circuit later clarified, however, that the Manicca precedent is binding. Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 n.2 (11th Cir. 2006).

[3] It is not at all clear to this Court the high standard for comparators in the employment discrimination context should apply in the restaurant context. District courts in the Eleventh Circuit have, in fact, applied a more relaxed standard for comparators in the retail context. See Slocumb, 365 F. Supp. 2d at 1339 (requiring that the circumstances between comparators be "reasonably close" and finding that smaller

to create a prima facie case of discrimination.

The size of a party requesting seating at a restaurant is clearly relevant to the "similarly situated" inquiry. As Defendants point out, the Plaintiffs' groups of thirty-nine and fifty were much larger than the Caucasian groups of two to six. These groups would put drastically different demands on the restaurant's available seating, staff, and resources. Consequently, the smaller, non-minority groups cannot serve as comparators for the larger groups of Plaintiffs.

There is evidence, however, that Plaintiffs requested to be seated individually instead of as a large group. Both the hostess and the manager were aware of this request. Furthermore, Shoney's employees and the restaurant's owner stated that they would seat a large group individually if that is what the customers requested. The two large groups of approximately thirty-nine and fifty people thus actually consisted of multiple parties of smaller groups. Those smaller groups were therefore similarly situated to the smaller groups of two- to six-person non-minority parties that entered the restaurant after Plaintiffs did, yet were seated while Plaintiffs were not. Even if Shoney's could not seat every one of Plaintiffs' smaller parties simultaneously, they certainly could have seated at least some of them before the Caucasian parties who arrived after Plaintiffs.

---

groups of white customers were similarly situated to a larger African American group); Jackson, 413 F. Supp. 2d at 1358-59 (requiring that comparators be "similar in significant respects"). In cases alleging employment discrimination, a high standard is necessary because courts must balance the interests of preventing unlawful discrimination with the need to maintain the employer's discretion in hiring, firing, and disciplining its employees. These countervailing interests are not present, however, when dealing with private parties attempting to contract with each other. The Court does not need to resolve this issue, however, because Plaintiffs's evidence meets the higher standard.

Defendants argue that even assuming the Memphis and Atlanta Plaintiffs requested to be sat in smaller parties, they still fail to establish that they were similarly situated to the Caucasian patrons who were sat during the time in question. They contend that "Plaintiffs never presented themselves for service to Shoney's as individuals because they never individually requested a seat" and the potential comparators, on the contrary, "requested individual seats." (Defs.' Br. Mot. Summ. J. 16.)

The "similarly situated" requirement, though stringent, does not require that the individuals be nearly identical in every respect; rather they must be nearly identical in every *relevant* respect. Holifield, 115 F.3d at 1562. Defendants make a distinction between whether the group asked for individual seating through a leader, or by individually approaching the hostess and requesting it in person. They point to nothing, however, that would make that distinction a relevant factor in restaurant seating. It is immaterial whether the hostess and the manager knew that Plaintiffs wanted to be seated at separate tables because one person told them or eighty-nine people told them. They made no effort to seat the proposed smaller African-American groups while they quickly sat the small tables of Caucasian patrons. Plaintiffs therefore meet their burden of establishing a prima facie case of discrimination.

b. Legitimate, Nondiscriminatory Reason

The prima facie case establishes an inference of discriminatory intent; if the defendant is silent in the face of the prima facie case, a legally mandatory inference of discrimination arises from the plaintiff's initial evidence. Burdine, 450 U.S. at 254. That inference drops from the case, however, once the defendant produces a legitimate,

nondiscriminatory reason for the way it treated the plaintiff.  Id.  To meet this burden the defendant must use admissible evidence to demonstrate the reasons for its decision that, if believed, would support a finding that the action was not a result of unlawful discrimination. Id. at 255.  The burden on the defendant is "exceedingly light."  Perryman v. Johnson Prods. Co., Inc., 698 F.2d 1138, 1142 (11th Cir. 1983).  It is a burden of production, not persuasion, and involves no credibility assessment by the court.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).  Thus, the reason does not have to be persuasive–it must only be a reason other than discrimination. Brown, 939 F.2d at 951.

Defendants present several legitimate, nondiscriminatory reasons for the way Plaintiffs were treated.  First, they accuse the Memphis Plaintiffs of "refus[ing] to be patient and cooperate with the Shoney's staff."  (Defs.' Br. Mot. Summ. J. 19.)  Second, they assert that Plaintiffs jumped to the conclusion that Shoney's was discriminating against them and that their allegations were unfounded.  Third, they were interfering with other patron's ability to enter the restaurant and making them uncomfortable with their videotaping.  Finally, they did not seat the Atlanta Plaintiffs because the employees mistakenly assumed they were with the uncooperative Memphis party.

The proffered reasons for Defendants' actions are nondiscriminatory, and therefore Defendants have met their burden of production to rebut the prima facie case.  The inference of discrimination that the prima facie case creates therefore falls away and the burden of persuasion returns to Plaintiffs, who must present sufficient evidence that would allow a jury to find that the reasons Defendants cite are pretextual.

13

### c. Evidence of Pretext

Once the defendant proffers a legitimate, nondiscriminatory reason for his actions, the plaintiff must present evidence that the reason is actually a pretext for discrimination in order to survive summary judgment. See Burdine, 450 U.S. at 253-54. The plaintiff may prove pretext in one of two ways: either directly by showing that discrimination more likely motivated the defendant, or indirectly by showing that the proffered reason is not credible. Id. at 256. As discussed above, Plaintiffs in this case must rely on indirect proof of pretext due to the lack of direct evidence. The Court discusses each of Defendants' proffered reasons in turn, taking the facts in the light most favorable to Plaintiffs.

Shoney's contends that it did not seat Plaintiffs because of their impatience and failure to cooperate with the seating policy. They cite heavily to the depositions of Shoney's employees as support for this reason. Hostess Sabrina Johnson stated that it was five to eight minutes before the group of Memphis Plaintiffs become "unruly." (S. Johnson Dep. 35:11-19.) Plaintiffs, however, testified that they did not begin to express their dissatisfaction with the wait until after their first conversation with the manager, which was approximately twenty minutes after their arrival. Furthermore, they stated that they were doing nothing that would justify refusing them service. A jury could find that this reason is pretextual if they either believed that Plaintiffs were not unruly or that Shoney's sat tables of white customers before the time when Plaintiffs allegedly began to be unruly. Plaintiffs have therefore presented sufficient evidence from which a jury could find this first reason pretexual.

Defendants next claim that they did not seat Plaintiffs because of the unfounded

accusations of racism. Again, there is nothing in the record suggesting that Plaintiffs entered Shoney's and immediately began launching allegations of racism at the employees. On the contrary, even the hostess stated that it was only after the initial five to eight minute wait that she heard any suggestion of racism. Plaintiffs' testimony indicated that they wondered among themselves whether race played a part in the manager's decisions but they did not directly accuse the manager of discrimination. A jury could find that this second reason is a pretext for discrimination if they believe that Plaintiffs were not directly accusing Shoney's of discriminating, or if they believe that parties of white people were sat before any accusations of racism were made.

Next, Defendants allege that they refused to seat Plaintiffs because they were blocking the entrance of the restaurant and making customers uncomfortable by videotaping the scene. Plaintiffs' testified, however, that groups of white people entered the restaurant through the front entrance and were seated while they waited. It is also clear from the DVD that the foyer was not completely blocked. In addition, the DVD footage inside the restaurant does not begin until law enforcement arrived, which was after the manager had refused to seat them. A jury could find that Plaintiffs were in fact not blocking the door or videotaping before they were refused service, and therefore determine that the third reason is pretextual.

Finally, Defendants claim that they refused service to the Atlanta Plaintiffs because they mistakenly assumed that Alford, the group's representative, was with the Memphis bus. Whether this reason was a pretext for discrimination against the Atlanta Plaintiffs hinges on whether the reasons for not seating the Memphis bus were pretextual.

15

In other words, Shoney's cannot claim that it did not intentionally discriminate against one group simply because they thought that group belonged to another party against whom Shoney's *was* discriminating against. Because Plaintiffs presented sufficient evidence to allow a jury to find the first three reasons were a pretext for discrimination, it also provided sufficient evidence to allow a jury to find that the reason for denying service to the Atlanta bus was also pretextual.

Plaintiffs also argue that there is other evidence that is circumstantial proof of intentional discrimination. They claim that they witnessed a Caucasian party entering from the restaurant's service entrance who was sat after they were denied service. Additionally, the manager refused to seat them as small groups even though there was evidence that Shoney's allows large groups to break up into smaller groups upon request. The manager called the police on Plaintiffs, even though there was no disruption or boisterous behavior for which law enforcement could lawfully eject Plaintiffs.

Viewing the record as a whole and in the light most favorable to Plaintiffs, this Court finds that there are sufficient facts which, if believed, would allow a fact finder to determine that Shoney's intentionally discriminated against Plaintiffs. Summary judgment on this issue is therefore inappropriate.

### C. Cecil Loney

Defendants argue that Plaintiff Cecil Loney cannot recover under § 1981 because he actually did eat breakfast at Shoney's on the morning in question. Section 1981 protects an individual's "enjoyment of all benefits, privileges, terms, and conditions of the contractual

relationship." 42 U.S.C.A. § 1981(b). Thus, liability attaches if the defendant's discriminatory acts interfere with the full enjoyment of the contract, even when the plaintiff does eventually complete the retail transaction. See, e.g., Jackson, 413 F. Supp. 2d at 1358 (holding that asking a minority customer to prepay while allowing Caucasian customers to pay after they received food was actionable under § 1981); Perry v. Burger King Corp., 924 F. Supp. 548, 551-52 (S.D.N.Y. 1996) (depriving customer of ability to use bathroom at restaurant prevented him from enjoying full and equal benefit of the contract); Hernandez v. Erlenbusch, 368 F. Supp. 752, 755 (D.C. Or. 1973) (finding that prohibition on speaking a foreign language at a tavern deprived plaintiffs of their right to enjoy the equal benefit of the contractual relationship).

Here, Loney presents sufficient evidence to create an issue of material of fact regarding whether Shoney's employees' discriminatory acts deprived him of his full enjoyment of the benefits, privileges, terms, and conditions of his contractual relationship with Shoney's. Loney testified that he was not seated due to his race and he thus had to seat himself. No one brought him a menu so he was forced to eat from the buffet. He also stated a waitress tried to physically prevent him from serving himself at the breakfast bar. If a jury finds these facts are true, then they would support a finding of liability under § 1981.

### D. Dallas Hunt

Defendants point out that Dallas Hunt was not directly involved in any of the events that occurred on the day in question. Plaintiffs claim, however, that he is liable under § 1981 because he "directed the alleged wrongful conduct," by approving Shoney's policies

as written and as implemented. (Pls.' Br. Resp. Defs. Mot. Summ. J. 4.) Plaintiffs do not cite to the record to support this assertion.

A claim seeking personal liability under § 1981 must be predicated on some causal connection between the defendant's conduct and the discriminatory conduct. <u>Allen v. Denver Pub. Sch. Bd.</u>, 928 F.2d 978, 983 (10th Cir. 1991), <u>overruled on other grounds by Kendrick v. Penske Transp. Servs.</u>, 200 F.3d 1220, 1228 (10th Cir. 2000); <u>Wallace v. DM Customs, Inc.</u>, No.8:04-cv-115, 2006 WL 2882715, at *7 (M.D. Fla. 2006); <u>Bernard v. Calejo</u>, 17 F. Supp. 2d 1311, 1314-15 (S.D. Fla. 1998). At a minimum, the defendant must have known about the alleged acts of discrimination and failed to prevent or remedy them. <u>Wallace</u>, 2006 WL 2882715, at *7.

Despite an exhaustive review of the record, the Court finds no evidence of a causal link between the alleged acts of discrimination and Hunt's conduct. He did provide some training to managers. He did not, however, provide any direction that could be construed to authorize or acquiesce in discriminatory conduct. Hunt stated that the only disciplinary problems he had with Royce Wiley, the manager, were regarding his work schedule. There is no evidence of previous accusations of racism against Shoney's. Hunt had no personal involvement in the alleged racism, either directly or by knowingly acquiescing to discriminatory conduct. The claim against him is therefore dismissed.

### III.     CONCLUSION

Defendants' Motion for Summary Judgment is hereby granted with regard to Defendant Dallas Hunt. The court orders that he be dismissed from the case with

prejudice.  The Motion is denied as to Defendant Cordele Foods.

SO ORDERED, this 30th day of September, 2007.

*/s/ Hugh Lawson*

**HUGH LAWSON, Judge**

tch